WO                    IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


MICHELLE B. ORTIZ,                    )
                                      )
                    Plaintiff,        )
                                      )
        vs.                           )
                                      )
CAROLYN W. COLVIN, acting             )
Commissioner, Social Security         )
Administration,                       )
                                      )        No. 2:14-cv-0567-HRH
                    Defendant.        )
_____)

O R D E R

Defendant moves[1] to alter or amend the court's judgment, dated August 3, 2015.  This

motion is opposed.[2]  Oral argument was not requested and is not deemed necessary.

Background

On March 24, 2010, plaintiff filed applications for disability benefits under Titles II and

XVI of the Social Security Act.  Plaintiff's applications were denied initially and upon

reconsideration.  After a hearing on June 8, 2012, an administrative law judge (ALJ) denied

plaintiff's claims.  On January 29, 2014, the Appeals Council denied plaintiff's request for

_____

[1]Docket No. 34.

[2]Docket No. 37.

review, thereby making the ALJ's July 5, 2012 decision the final decision of the Commissioner.  On March 19, 2014, plaintiff commenced this action in which she asked the court to find that she was entitled to disability benefits.

Plaintiff argued that the ALJ erred in finding her pain and symptom statements less than credible and defendant agreed that the ALJ's credibility findings were insufficient.[3]  The parties disagreed as to whether this error required a remand for further proceedings or a remand for an award of benefits.  The court concluded that a remand for an award of benefits would be appropriate.[4]  In reaching this conclusion, the court rejected defendant's argument that further proceedings would be appropriate so that the ALJ could obtain a consultative examination to help the ALJ assess the severity and functional effects of plaintiff's fibromyalgia.[5]  The court explained that "[i]f the ALJ felt that a consultative examination was necessary to make a credibility finding, he could have obtained one."[6]  The court also rejected defendant's argument that further proceedings were necessary because the record contained significant evidentiary conflicts between plaintiff's pain and symptom statements and the

_____

[3]Opposed Motion for Remand at 4, Docket No. 27.

[4]Order at 11 & 14, Docket No. 31.

[5]Id. at 9-10.

[6]Id. at 10.

medical evidence.[7]  Citing to <u>Moisa v. Barnhart</u>, 367 F.3d 882 (9th Cir. 2004), the court stated

that defendant should not have another opportunity to show that plaintiff was not credible.[8]

The court also found that the ALJ had erred in rejecting the only opinion in the record

from a treating physician, that of Dr. Bhalla.[9]  The court determined that none of the reasons

the ALJ gave for rejecting Dr. Bhalla's opinion were legitimate.[10]

The court found that plaintiff would be disabled if her statements and Dr. Bhalla's

opinion were credited as true, based on the testimony of the vocational expert.[11]  The court

then considered whether the record as a whole created serious doubt that plaintiff was

disabled and concluded that it did not.[12]

Judgment remanding this matter for an award of benefits was entered on August 5,

2015.[13]  Pursuant to Rule 59(e), Federal Rules of Civil Procedure, defendant now moves to

alter or amend the judgment, arguing that the court committed clear error in concluding that

the ALJ erred in rejecting the opinion of Dr. Bhalla and in concluding that a remand for an

---

[7]<u>Id.</u> at 10-11.

[8]<u>Id.</u> at 11.

[9]<u>Id.</u> at 12-14.

[10]<u>Id.</u> at 12-14.

[11]<u>Id.</u> at 8 & 14.

[12]<u>Id.</u> at 14.

[13]Docket No. 32.

award of benefits would be appropriate.

<u>Discussion</u>

"Amendment or alteration is appropriate under Rule 59(e) if (1) the district court is presented with newly discovered evidence, (2) the district court committed clear error or made an initial decision that was manifestly unjust, or (3) there is an intervening change in controlling law." <u>Zimmerman v. City of Oakland</u>, 255 F.3d 734, 740 (9th Cir. 2001).

Defendant first argues that the court committed clear error in concluding that the ALJ erred in rejecting Dr. Bhalla's opinion. On June 4, 2012, Dr. Bhalla completed a Fibromyalgia Residual Functional Capacity (RFC) Questionnaire, in which he opined that plaintiff had moderately severe pain and fatigue which would frequently interfere with her attention and concentration and that she would frequently "experience deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner...."[14] Dr. Bhalla also opined that plaintiff would not be able to sustain work on a regular and continuing basis.[15]

The ALJ rejected Dr. Bhalla's opinion "because it is unsupported by the greater objective record", "Dr. Bhalla provided no function-by-function analysis," "the opinion is vague and imprecise, and does not define the terms used", and "the opinion is conclusory,

---

[14]Admin. Rec. at 315-316.

[15]Admin. Rec. at 316.

with little explanation...."[16]  The court concluded that none of these reasons were legitimate reasons.

In her opening brief, defendant takes issue only with the court's conclusion as to the third reason.  The court concluded that the third reason given by the ALJ for rejecting Dr. Bhalla's opinion was not legitimate because Dr. Bhalla's "opinion was based on his and [PAC] Nelson's significant experience with plaintiff and supported by their treatment notes."[17] Defendant argues that this was clear error because the treatment notes do not render the ALJ's rejection of Dr. Bhalla's opinion irrational.  More specifically, defendant argues that the treatment notes do not support Dr. Bhalla's and Nelson's endorsement of frequent problems with attention and concentration.   Defendant acknowledges that the treatment notes document some clinical findings such as positive trigger points and tenderness on palpitation, but defendant argues that these clinical signs do not compel the conclusion that plaintiff suffered frequent problems with attention and concentration.  Rather, defendant contends that the ALJ could rationally conclude that the treatment notes did not record any clinical signs of frequent concentration and attention problems given that Nelson and Dr. Bhalla never expressly assessed any cognitive limitations.  Defendant argues that the ALJ is required to look for supporting explanation and evidence offered with the opinion, rather

---

[16]Admin. Rec. at 27.

[17]Order at 13-14, Docket No. 31.

than looking to treatment notes, and that it is improper to infer the basis of a medical opinion based solely on the presence of treatment notes.

The court did not commit clear error in finding that the ALJ's third reason for rejecting Dr. Bhalla's opinion was not legitimate. Defendant is correct that an ALJ may properly reject the opinion of a treating physician "'if that opinion is brief, conclusory, and inadequately supported by clinical findings.'" Chaudhry v. Astrue, 688 F.3d 661, 671 (9th Cir. 2012) (quoting Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1228 (9th Cir. 2009)). Defendant is also correct that an "ALJ may 'permissibly reject[ ] ... check-off reports that [do] not contain any explanation of the bases of their conclusions.'" Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) (quoting Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996)). However, as the court explained in its order, the Ninth Circuit has held that a check-box form, such as Dr. Bhalla used, is entitled to weight if it is based on the physician's "significant experience" with the plaintiff and "supported by numerous records." Garrison v. Colvin, 759 F.3d 995, 1013 (9th Cir. 2014). Nelson and Dr. Bhalla had significant experience with plaintiff and their treatment notes supported Dr. Bhalla's opinion.[18]

In her reply brief, defendant argues that the first reason given by the ALJ, that Dr. Bhalla's opinion was unsupported by the greater medical record, was legitimate because the

---

[18]As is the court's practice with Social Security cases, it prepared a digest of the medical evidence of record. That digest is attached as an appendix to this order. Dr. Bhalla's and PAC Nelson's treatments notes can be found at pages 6-15 of the appendix.

sources who actually evaluated plaintiff's cognitive functioning observed a "normal attention span and concentration."  Defendant then cites to three treatment notes from plaintiff's urologist.[19]

This argument fails.  The ALJ did not cite to these three treatment notes and nowhere in the ALJ's opinion did he explain how any of plaintiff's diagnostic tests or physical examinations undermined Dr. Bhalla's opinion.  Moreover, the urologist was not "evaluating" plaintiff's cognitive functioning but rather was making some general observations about plaintiff's mental state.

Defendant next argues that the court committed clear error by concluding that an award for benefits was the appropriate remedy.  More specifically, defendant argues that the court misapplied the "credit-as-true" analysis.  The court concluded that if plaintiff's subjective pain and symptom testimony were credited as true, then based on the testimony of the vocational expert, plaintiff would be disabled.[20]  In reaching this conclusion, the court rejected defendant's arguments that the record was not fully developed.  The court also concluded that if Dr. Bhalla's opinion were credited as true, then based on the testimony of the vocational expert, plaintiff would be disabled.[21]  The court then considered whether the record as the whole created serious doubt that plaintiff was disabled and concluded that it

---

[19]Admin. Rec. at 772, 785 & 803.

[20]Order at 8-9, Docket No. 31.

[21]Id. at 14.

did not.[22]  Defendant argues that this analysis was contrary to that set forth in Treichler v. Commissioner of Social Security Administration, 775 F.3d 1090 (9th Cir. 2014) and Brown-Hunter v. Colvin, — F.3d —, 2015 WL 6684997 (9th Cir. 2015).

In Treichler, the court laid out a three-step analysis to be used to determine whether a matter should be remanded for an award of benefits.  First, the court "ask[s] whether the 'ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'"  Treichler, 775 F.3d at 1100-01 (quoting Garrison, 759 F.3d at 1020).  "Second, if the ALJ erred, [the court] determine[s] whether the record has been fully developed, whether there are outstanding issues that must be resolved before a determination of disability can be made, and whether further administrative proceedings would be useful[.]"  Id. at 1101 (internal citations omitted).  "Third, if [the court] conclude[s] that no outstanding issues remain and further proceedings would not be useful, [the court] may apply [the] prophylactic Varney rule, finding the relevant testimony credible as a matter of law, and then determine whether the record, taken as a whole, leaves not the slightest uncertainty as to the outcome of [the] proceeding."  Id. (internal citations omitted).

Similarly, in Brown-Hunter, the court set out the three-step analysis to be used to determine whether a remand for an award of benefits would be appropriate.  "First, [the court] must conclude that 'the ALJ has failed to provide legally sufficient reasons for rejecting

---

[22]Id.

-8-

evidence, whether claimant testimony or medical opinion.'" <u>Brown-Hunter</u>, 2015 WL 6684997, at *7 (quoting <u>Garrison</u>, 759 F.3d at 1020). "Second, [the court] must conclude that 'the record has been fully developed and further administrative proceedings would serve no useful purpose.'" <u>Id.</u> (quoting <u>Garrison</u>, 759 F.3d at 1020). "Third, [the court] must conclude that 'if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.'" <u>Id.</u> (quoting <u>Garrison</u>, 759 F.3d at 1021). But, "even if all three requirements are met, [the court] retain[s] 'flexibility' in determining the appropriate remedy" and "may remand on an open record for further proceedings 'when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'" <u>Id.</u> (quoting <u>Garrison</u>, 759 F.3d at 1021).

Defendant argues that the court misapplied the second step of this analysis. Defendant contends that the court concluded that if plaintiff's statements and Dr. Bhalla's opinion were credited as true, then plaintiff would be disabled and thus there were no outstanding issues to be resolved. Defendant argues that this was clear error because the court must "assess whether there are outstanding issues requiring resolution <u>before</u> considering whether to hold the claimant's testimony credible as a matter of law." <u>Treichler</u>, 775 F.3d at 1105. In <u>Treichler</u>, the plaintiff "argue[d] that because the ALJ erred, [the court] should credit his testimony as true. Once [the court] ha[d] done so, he argue[d], there would be no outstanding issues to resolve and [the court] should remand for benefits." <u>Id.</u> The Ninth Circuit rejected this argument because "an ALJ's failure to provide sufficiently specific

reasons for rejecting the testimony of a claimant or other witness does not, without more, require the reviewing court to credit the claimant's testimony as true." Id. at 1106. At the second step of the analysis, the court must "consider whether the record as a whole is free from conflicts, ambiguities, or gaps, whether all factual issues have been resolved, and whether the claimant's entitlement to benefits is clear under the applicable legal rules." Id. at 1103-04. The record cannot be fully developed if it "'raises crucial questions as to the extent of a [claimant's] impairment given the inconsistencies between his testimony and the medical evidence in the record[.]'" Brown-Hunter, 2015 WL 6684997, at *7 (quoting Treichler, 775 F.3d at 1105).

This court found that further proceedings would not be appropriate here, in part, because defendant should not be given another opportunity to assess plaintiff's credibility and because the ALJ could have obtained a consultative examination prior to SSR 12-2p being published.[23] Defendant argues that this was clear error because "[t]he touchstone for an award of benefits is the existence of a disability, not the agency's legal error." Id. Defendant insists that courts must analyze whether errors can be corrected on remand, not whether they might have been avoided in the first place.

Defendant argues that the court's reliance on Moisa, 367 F.3d 882, was misplaced. There, the Ninth Circuit noted that when defendant loses an appeal, she "should not have

---

[23]Order at 9-10, Docket No. 31.

another opportunity to show that [the plaintiff] is not credible any more than [the plaintiff], had he lost, should have an opportunity for remand and further proceedings to establish his credibility." Id. at 887. Defendant argues that this statement was dicta and that it is contrary to the detailed holdings in Treichler and Hunter-Brown. Defendant also argues that the court's reliance on the proposition that defendant should not be given another opportunity to evaluate plaintiff's credibility appears to "rest on the cynical view that the agency and its adjudicators are more interested in denying benefits than in reaching good-faith, policy-compliant disability determinations based on careful consideration of all the evidence in the record."[24]

Defendant argues that if the court properly applied the second prong of the credit-as-true analysis, it would conclude that a remand for further proceedings is the appropriate remedy here. Defendant contends that the court "recognized" that plaintiff's statements are contradicted by other evidence in the record. This contention is based on what the court said in regards to defendant's argument that plaintiff's self-reported limitations were contradicted by other evidence. The court stated that

> defendant points out that plaintiff reported that she could not sit, stand or walk for any length of time and that her pain was getting worse over time, but also reported that she cared for her spouse and two children. As another example, defendant points out that plaintiff testified that she spends a majority of her time in the bathroom and has problems with incontinence, but the

---

[24]Motion to Alter or Amend Judgment [etc.] at 13, Docket No. 34.

> medical evidence shows that her bladder problem was surgically treated in September 2011, and at a March 2012 follow-up, she was doing well.[25]

Defendant insists that this show that there were inconsistencies that needed to be resolved and thus the court committed clear error in concluding that there were no outstanding factual issues to be resolved.

The court did not commit clear error in concluding that a remand for benefits was the appropriate remedy in this case. The court may have stated its conclusion as to step three of the credit-as-true analysis before it discussed step two of the analysis, but it did not fail to consider whether the record was fully developed, whether there were outstanding issues to be resolved, and whether further administrative proceedings were be useful. The court considered and rejected defendant's contention that a consultative examination would be helpful. The court considered and rejected defendant's argument that there were inconsistencies between plaintiff's statements and the medical evidence that needed to be resolved. And, the court considered whether additional testimony was needed from the vocational expert. Had the court discussed these issues, which are exactly what the Ninth Circuit has directed the court to consider at step two, prior to stating its step three conclusion, the result of the analysis would have been the same. The appropriate remedy would still have been an award for benefits because the ALJ erred as to plaintiff's pain and symptom

---

[25]Order at 10, Docket No. 31 (footnotes omitted).

statements and Dr. Bhalla's opinion, the "'record has been fully developed and further administrative proceedings would serve no useful purpose,'" and if plaintiff's statements and Dr. Bhalla's opinion were credited as true, the ALJ would be required to find plaintiff disabled.  <u>Brown-Hunter</u>, 2015 WL 6684997, at *7 (quoting <u>Treichler</u>, 775 F.3d at 1105).

<u>Conclusion</u>

Based on the foregoing, defendant's Rule 59(e) motion[26] is denied.

DATED at Anchorage, Alaska, this 20th day of November, 2015.

/s/ H. Russel Holland
United States District Judge

---

[26]Docket No. 34.

APPENDIX

I.  Examining sources

A.  North Family Medicine/Dr. Barlow

Dr. Barlow was plaintiff's PCP through September 2010.

On August 5, 2008, a CT of plaintiff's pelvis showed a "[m]oderately prominent uterus with probable posterior fibroid" and "nonspecific right parauterine calcification of indeterminate significance, but possibly representing a calcified lymph node."[1]

On February 2, 2009, x-rays of plaintiff's chest showed "[n]o acute cardiopulmonary process present."[2]

On March 30, 2009, plaintiff complained of headaches in which the pain travels from the base of her skull upwards and also with pain at temples and behind the eyes; and the assessments included headaches/migraines and hypertension.[3]

On April 3, 2009, plaintiff came in for a blood pressure check; and her physical exam was unremarkable.[4]

On April 25, 2009, plaintiff complained that she "wants to sleep all the time" and that she has trouble getting out of bed; the assessment was fibromyalgia; and it was noted that she

---

[1]Admin. Rec. at 426.

[2]Admin. Rec. at 425.

[3]Admin. Rec. at 385.

[4]Admin. Rec. at 384.

needs to be seen by a rheumatologist.[5]

On May 5, 2009, plaintiff's assessments were asthma, bronchitis, and hypertension.[6] On May 12, 2009, plaintiff reported that her asthma was "improved" but that she had been coughing all night; and the assessments included asthma and bronchitis.[7]  On May 13, 2009, plaintiff complained of stomach pain and cramping, diarrhea, nausea and that she feels bloated and gassy.[8]

On July 24, 2009, plaintiff complained of low abdominal pain and the assessments were right pelvic pain and possible right hernia.[9]

On August 5, 2009, plaintiff reported that her back had "popped" and she could not walk for four days; and the assessments included low back pain, overactive bladder, and fibromyalgia.[10]  On August 12, 2009, plaintiff complained of new pain in her thoracic spine and upper back; she had an abnormal gait, tenderness in her spine, and a negative straight leg raising test; and the assessments included hypertension and back pain.[11]  On August 26,

---

[5]Admin. Rec. at 393.

[6]Admin. Rec. at 383.

[7]Admin. Rec. at 382.

[8]Admin. Rec. at 392.

[9]Admin. Rec. at 391.

[10]Admin. Rec. at 381.

[11]Admin. Rec. at 380.

2009, plaintiff reported that her stomach pain was not better, that she has pain in her feet and that vicodin helps her sleep, but she does not take it during the day because it makes her drowsy.[12]

On September 1, 2009, plaintiff complained of a daily cough since taking Lisinoprol, which was "bothering [her] lifestyle" and that she is fatigued a lot; other than tenderness to palpation in her lower spine, her physical exam was unremarkable.[13]

On October 1, 2009, plaintiff reported that her cough is gone since she stopped taking Lisinoprol and that her back pain was continuing; and the assessments were hypertension and back pain.[14]

On November 9, 2009, plaintiff complained of chest tightness and low back pain; and the assessments included hypertension, back pain, and asthma.[15]  On November 26, 2009, plaintiff complained of muscle spasms in her back and that vicodin does not keep the pain down; and the assessments included low back pain.[16]

On December 21, 2009, plaintiff reported that she did not "feel right" and the

---

[12]Admin. Rec. at 390.

[13]Admin. Rec. at 377.

[14]Admin. Rec. at 376.

[15]Admin. Rec. at 375.

[16]Admin. Rec. at 389.

assessments included hypertension and back pain.[17]

On January 11, 2010, plaintiff complained of back pain and left foot pain; and the assessments were hypertension, fibromyalgia, back pain and foot pain.[18]

On February 11, 2010, plaintiff came in for a hypertension meds check and the assessments were hypertension and foot pain.[19]

On March 3, 2010, x-rays of plaintiff's left foot showed "[n]o fracture or acute bone pathology" and "moderate hypertrophy along the plantar surface of the calcaneus."[20]

On March 17, 2010, the assessments were left foot pain, fibromyalgia, and second degree burn on right arm; and Dr. Barlow noted that plaintiff's fibromyalgia was "well controlled right now."[21]

On April 20, 2010, plaintiff complained of a headache, running nose, body aches, and a cough; and the assessments included acute upper respiratory infection and renal insufficiency.[22]

On June 1, 2010, plaintiff complained of low back pain, right ear pain, and face pain;

---

[17]Admin. Rec. at 374.

[18]Admin. Rec. at 373.

[19]Admin. Rec. at 372.

[20]Admin. Rec. at 409.

[21]Admin. Rec. at 371.

[22]Admin. Rec. at 449.

and the assessments were urinary tract infection, upper respiratory infection, and renal insufficiency.[23]

On June 15, 2010, plaintiff reported that she needs more percocet than her rheumatologist prescribes and that she was told that she would be referred to pain management but that did not happen.[24]  The assessments were hypertension, fibromyalgia, renal insufficiency, and resolved upper respiratory infection.[25]

On September 14, 2010, the assessments were hypertension, renal insufficiency, and obesity.[26]

### B.  Dr. Chisholm

On September 10, 2008, plaintiff complained of pelvic pain and Dr. Chisholm began "work-up, check lab and cultures, pelvic ultrasound, begin trial of ABs, cycle with OC, reeval in 6-12 weeks."[27]  On September 16, 2008, the ultrasound showed "[m]ildly prominent endometrial stripe" and "a 2.7 cm cyst present in the left ovary."[28]

On October 8, 2008, Dr. Chisholm "discussed risk/benefits and also possibility pain is

---

[23]Admin. Rec. at 531.

[24]Admin. Rec. at 481.

[25]Admin. Rec. at 481.

[26]Admin. Rec. at 529.

[27]Admin. Rec. at 338.

[28]Admin. Rec. at 339.

probably not related to the fibroid and surgery may not correct this, pt. wants to proceed due to bleeding and chance of cure.  will return for pre-op visit."[29]

On January 7, 2009, plaintiff came in for her pre-op appointment but advised Dr. Chisholm that she needed to postpone her surgery until she moved.[30]

On February 18, 2009, plaintiff had a hysterectomy.[31]

On March 25, 2009, plaintiff complained of abdominal pains and loose stools and she requested pain medication.[32]  Dr. Chisholm's exam revealed that plaintiff had a tender abdomen and he thought she may have irritable bowel syndrome.[33]

### C.  Valley Arthritis Care/PAC Nelson/Dr. Bhalla

Plaintiff was treated for her fibromyalgia, arthritis, and degenerative disc disease  by PAC Nelson and Dr. Bhalla from August 2009 through May 10, 2012.  Plaintiff generally saw PAC Nelson, who was supervised by Dr. Bhalla.

On August 14, 2009, plaintiff's exam showed positive trigger points at the occipital muscle, the supraspinatus muscle, the trapezius muscle, the gluteal muscles, the greater trochanter, the anterior lower cervical region, the second costochondral junction, the lateral

---

[29]Admin. Rec. at 336.

[30]Admin. Rec. at 335.

[31]Admin. Rec. at 332.

[32]Admin. Rec. at 325.

[33]Admin. Rec. at 325-326.

epicondyle, and the medial knee; and muscle spasms were observed.[34]  The assessments were fibromyalgia, diabetes mellitus, and lumbar radiculopathy.[35]

On September 18, 2009, plaintiff's exam was the same as her August 15, 2009 exam; and the assessments were fibromyalgia, diabetes mellitus, and lumbar radiculopathy.[36]

A September 24, 2009, MRI of plaintiff's lumbar spine showed "[s]mall posterior central disk protrusion at L5-S1" but was otherwise unremarkable.[37]

On September 30, 2009, plaintiff's "[l]umbosacral spine exhibited tenderness on palpation.  Lumbosacral spine exhibited muscle spasms.  A straight-leg raising test of the right leg was positive."[38]  Plaintiff had positive trigger points at the occipital  muscle, the supraspinatus muscle, the trapezius muscle, the gluteal muscles, the greater trochanter, the anterior lower cervical region, the second costochondral junction, the lateral epicondyle, and the medial knee.[39]  The assessments were fibromyalgia, diabetes mellitus, and lumbar radiculopathy.[40]

---

[34]Admin. Rec. at 356.

[35]Admin. Rec. at 356-357.

[36]Admin. Rec. at 359.

[37]Admin. Rec. at 444.

[38]Admin. Rec. at 361.

[39]Admin. Rec. at 361.

[40]Admin. Rec. at 361.

-7-

On November 30, 2009, plaintiff's exam was the same as it had been on September 30, 2009; the assessments were fibromyalgia, diabetes mellitus, and lumbar radiculopathy; and plaintiff was going to be scheduled for pain management.[41]

On January 25, 2010, plaintiff complained of fatigue, headache, dryness of the eyes, soft tissue stiffness, back pain and stiffness, numbness, memory lapses or loss, and sleep disturbances.[42]   Plaintiff's "[l]umbosacral spine exhibited tenderness on palpation. Lumbosacral spine exhibited muscle spasms.  A straight-leg raising test of the right leg was positive."[43]  Plaintiff had positive trigger points at the occipital muscle, the supraspinatus muscle, the trapezius muscle, the gluteal muscles, the greater trochanter, the anterior lower cervical region, the second costochondral junction, the lateral epicondyle, and the medial knee.[44]  The assessments were fibromyalgia, diabetes mellitus, and lumbar radiculopathy.[45] Plaintiff's prescriptions included temazepam, restoril, skelexin, percocet, and naprelan.[46]

On April 23, 2010, plaintiff's physical exam of her ""[c]ervical spine showed tenderness on palpation.... Lumbosacral spine exhibited tenderness on palpation.

_____

[41]Admin. Rec. at 362-363.

[42]Admin. Rec. at 364.  Plaintiff raised similar complaints at most of her appointments with Nelson and Dr. Bhalla.

[43]Admin. Rec. at 365.

[44]Admin. Rec. at 365.

[45]Admin. Rec. at 365.

[46]Admin. Rec. at 365.

Lumbosacral spine exhibited muscle spasms.  A straight-leg raising test of the right leg was positive."[47]   Plaintiff has positive trigger points at the occipital muscle, the supraspinatus muscle, the trapezius muscle, the gluteal muscles, the greater trochanter, the anterior lower cervical region, the second costochondral junction, the lateral epicondyle, and the medial knee.[48]  The assessments were fibromyalgia, diabetes mellitus, and lumbar radiculopathy.[49]

On May 3, 2010, x-rays of plaintiff's hands showed "[d]egenerative changes at the 5th DIP joint bilaterally.  No other specific arthropathic change on either side and no acute osseous findings."[50]  May 3, 2010 x-rays of plaintiff's lumbar spine showed an "[e]ssentially normal lumbar spine."[51]  May 3, 2010 x-rays of plaintiff's cervical spine showed "[m]inor spurring at the C5-6 level but no other evidence of disk or facet joint degeneration.  No spinal stenosis."[52]

On June 23, 2010, plaintiff's "[c]ervical spine showed tenderness on palpation.... Lumbosacral spine exhibited tenderness on palpation.  Lumbosacral spine exhibited muscle

---

[47]Admin. Rec. at 628.

[48]Admin. Rec. at 629.

[49]Admin. Rec. at 629.

[50]Admin. Rec. at 632.

[51]Admin. Rec. at 633.

[52]Admin. Rec. at 634.

spasms.  A straight-leg raising test of the right leg was positive."[53]  Plaintiff had positive trigger points at the occipital muscle, the supraspinatus muscle, the trapezius muscle, the gluteal muscles, the greater trochanter, the anterior lower cervical region, the second costochondral junction, the lateral epicondyle, and the medial knee.[54]  The assessments were fibromyalgia, diabetes mellitus, and lumbar radiculopathy; and the plan was to obtain an MRI of plaintiff's lumbar spine and continue current medication, which included Percocet, temazepam restoril, skelexin, lyrica, and naprelan.[55]

On September 1, 2010, plaintiff's "[c]ervical spine showed tenderness on palpation.... Lumbosacral spine exhibited tenderness on palpation.  Lumbosacral spine exhibited muscle spasms.  A straight-leg raising test on the right leg was positive."[56]  Plaintiff had positive trigger points at the occipital muscle, the supraspinatus muscle, the trapezius muscle, the gluteal muscles, the greater trochanter, the anterior lower cervical region, the second costochondral junction, the lateral epicondyle, and the medial knee.[57]  The assessments were fibromyalgia, diabetes mellitus, and lumbar radiculopathy.[58]

---

[53]Admin. Rec. at 625.

[54]Admin. Rec. at 625.

[55]Admin. Rec. at 625-626.

[56]Admin. Rec. at 569.

[57]Admin. Rec. at 569-570.

[58]Admin. Rec. at 570.

October 4, 2010 x-rays of plaintiff's knees showed "[p]robable soft tissue calcifications on the left.  Otherwise, unremarkable knees."[59]

On November 5, 2010, plaintiff's "[c]ervical spine showed tenderness on palpation.... Lumbosacral spine exhibited tenderness on palpation.  Lumbosacral spine exhibited muscle spasms.  A straight-leg raising test on the right leg was positive."[60]  Plaintiff had positive trigger points at the occipital muscle, the supraspinatus muscle, the trapezius muscle, the gluteal muscles, the greater trochanter, the anterior lower cervical region, the second costochondral junction, the lateral epicondyle, and the medial knee.[61]  The assessments were fibromyalgia, diabetes mellitus, and lumbar radiculopathy.[62]

The November 16, 2010 MRI of plaintiff's left knee was "[e]ssentially unremarkable" and showed "[n]o discrete meniscal tear or evidence for ligament injury."[63]

On December 6, 2010, plaintiff's "[c]ervical spine showed tenderness on palpation.... Lumbosacral spine exhibited tenderness on palpation.  Lumbosacral spine exhibited muscle spasms.  A straight-leg raising test on the right leg was positive."[64]  Plaintiff had positive

_____

[59]Admin. Rec. at 572.

[60]Admin. Rec. at 565.

[61]Admin. Rec. at 565-566.

[62]Admin. Rec. at 566.

[63]Admin. Rec. at 631.

[64]Admin. Rec. at 592.

trigger points at the occipital muscle, the supraspinatus muscle, the trapezius muscle, the gluteal muscles, the greater trochanter, the anterior lower cervical region, the second costochondral junction, the lateral epicondyle, and the medial knee.[65]  The assessments were fibromyalgia, renal insufficiency, diabetes mellitus, and lumbar radiculopathy.[66]

On March 21, 2011, Dr. Bhalla noted that "[e]valuation of the Left median motor and Right ulnar sensory nerves showed reduced amplitude....  The Right median motor nerve showed prolonged distal onset latency (4.4 ms) and reduced amplitude....  The Left median sensory and the Right median sensory nerves showed prolonged distal peak latency ... and decreased conduction velocity....  All remaining nerves ... were within normal limits.  All F Waves latencies were within normal limits."[67]  Dr. Bhalla's impression was bilateral carpal tunnel.[68]

On June 7, 2011, plaintiff's ""[c]ervical spine showed tenderness on palpation.... Lumbosacral spine exhibited tenderness on palpation.  Lumbosacral spine exhibited muscle spasms.  A straight-leg raising test of the right leg was positive."[69]  Plaintiff had positive trigger points at the occipital muscle, the supraspinatus muscle, the trapezius muscle, the

---

[65]Admin. Rec. at 592-593.

[66]Admin. Rec. at 593.

[67]Admin. Rec. at 639.

[68]Admin. Rec. at 639.

[69]Admin. Rec. at 622.

gluteal muscles, the greater trochanter, the anterior lower cervical region, the second costochondral junction, the lateral epicondyle, and the medial knee.[70]  The assessments were fibromyalgia, renal insufficiency, diabetes mellitus, carpal tunnel syndrome, and lumbar radiculopathy.[71]

June 22, 2011, x-rays of plaintiff's lumbar spine showed "some minimal degenerative lipping about the anterolateral aspect of the superior and inferior endplates of L4 and the inferior endplate of L5.  There is some subtle disc space narrowing at the L5-S1 interspace with some arthrosis of the arthrodial facets of the lower lumbar spine.  Remaining osseous architecture is preserved."[72]

On August 1, 2011 plaintiff's "[c]ervical spine showed tenderness on palpation.... Lumbosacral spine exhibited tenderness on palpation.  Lumbosacral spine exhibited muscle spasms.  A straight-leg raising test of the right leg was positive."[73]  Plaintiff had positive trigger points at the occipital muscle, the supraspinatus muscle, the trapezius muscle, the gluteal muscles, the greater trochanter, the anterior lower cervical region, the second

---

[70]Admin. Rec. at 622-623.

[71]Admin. Rec. at 623.

[72]Admin. Rec. at 630.

[73]Admin. Rec. at 636.

costochondral junction, the lateral epicondyle, and the medial knee.[74]  The assessments were fibromyalgia, renal insufficiency, diabetes mellitus, lumbar disc degeneration, carpal tunnel syndrome, and lumbar radiculopathy.[75]

On October 3, 2011, plaintiff's physical exam was the same as it was on August 1, 2011; and the assessments were fibromyalgia, renal insufficiency, diabetes mellitus, lumbar disc degeneration, carpal tunnel syndrome, and lumbar radiculopathy.[76]

On January 3, 2012, plaintiff's physical exam was the same as it was on October 3, 2011; and the assessments were fibromyalgia, renal insufficiency, diabetes mellitus, lumbar disc degeneration, carpal tunnel syndrome, and lumbar radiculopathy.[77]  The plan was to continue plaintiff's current medications which were percocet and lyrica.[78]

On May 14, 2010, plaintiff's "[c]ervical spine showed tenderness on palpation.... Lumbosacral spine exhibited tenderness on palpation.  Lumbosacral spine exhibited muscle spasms.  A straight-leg raising test on the right leg was positive."[79]  Plaintiff had positive trigger points at the occipital muscle, the supraspinatus muscle, the trapezius muscle, the

---

[74]Admin. Rec. at 636-637.

[75]Admin. Rec. at 637.

[76]Admin. Rec. at 618-619.

[77]Admin. Rec. at 614-615.

[78]Admin. Rec. at 615.

[79]Admin. Rec. at 609-610.

gluteal muscles, the greater trochanter, the anterior lower cervical region, the second costochondral junction, the lateral epicondyle, and the medial knee.[80]  The assessments were fibromyalgia, hypertension, renal insufficiency, diabetes mellitus, lumbar disc degeneration, carpal tunnel syndrome, and lumbar radiculopathy.[81]

On June 4, 2012, Dr. Bhalla completed a Fibromyalgia Residual Functional Capacity (RFC) Questionnaire, which is a check-box form.  Dr. Bhalla noted that in addition to fibromyalgia, plaintiff had degenerative disc disease.[82]  He noted that plaintiff's symptoms included multiple tender points, nonrestorative sleep, frequent severe headaches, severe fatigue, abdominal pain, diarrhea and/or constipation, cognitive impairment, and low back pain.[83]  He opined that plaintiff had moderately severe pain and fatigue which would frequently interfere with her attention and concentration and that she would frequently "experience deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner...."[84]  And, he opined that plaintiff would be unable to sustain work on a regular and continuing basis.[85]

---

[80]Admin. Rec. at 610.

[81]Admin. Rec. at 610.

[82]Admin. Rec. at 314.

[83]Admin. Rec. at 314.

[84]Admin. Rec. at 314-316.

[85]Admin. Rec. at 316.

D.  Valley Foot Care

On April 7, 2010, Dr. Sekosky noted that plaintiff was complaining of "left foot pain plantar waypoint specifically into the intermetatarsal space number two on the left foot"; his examination showed "tenderness with metatarsal palpation" and his impression was "[n]euritis/possible metatarsal fracture" and he ordered x-rays and an ultrasound.[86]  The April 13, 2010 ultrasound of plaintiff's left foot showed "no evidence for a Morton's neuroma" and that "there is a nonspecific small ovoid lesion within the plantar soft tissues at the distal second and third metatarsal levels, appears to correspond to patient's symptoms. Consider a small inflammatory nodule or other mass.  A small giant cell tumor of the tendon sheath could be a consideration as it is in the vicinity of the second and third toe flexor tendons."[87]  The April 13, 2010 x-rays showed "[n]o evidence for fracture."[88]

A May 3, 2010 MRI of plaintiff's foot showed that "[t]here is a discrete lobular 1 cm enhancing lesion in the plantar soft tissues at the second and third metatarsal head level.  The findings suggest a small inflammatory process.  A giant cell tumor of the tendon sheath is a consideration.  The findings would be atypical, although somewhat superficial location for

_____

[86]Admin. Rec. at 439.

[87]Admin. Rec. at 441.

[88]Admin. Rec. at 443.

a Morton's neuroma, is not excluded.  There is no evidence for a ganglion cyst."[89]

On May 12, 2010, plaintiff continued "to relay sensation of feeling a bump in the bottom of her foot and points quite proximal with respect to where a neuroma would actually be and this seems to be less likely."[90] Dr. Sekosky's impression/plan was "[p]ossible ganglion/neuroma with additional differentiation.  Differential diagnosis of giant cell tumor tendon sheath.  Refer to Dr. Matt Seidel for management and direction."[91]

### E.  Dr. Seidel/Dr. Brimacombe

On June 17, 2010, plaintiff "present[ed] for consultation regarding a mass on the plantar aspect of her left foot.  This [has] become quite painful and has caused her to ambulate on the side of her foot causing callus and pain in that area also.  MRI scan shows a inflammatory-appearing mass on the plantar aspect of the foot beneath the second and third metatarsal heads.  Unfortunately I do not believe it is accessible through a dorsal approach and therefore a plantar incision will need to be made.  We had a long discussion regarding the possibilities of painful scarring on the plantar aspect of the foot.  The patient wished to proceed with an excision and she will be scheduled for surgery as soon as

_____

[89]Admin. Rec. at 451.

[90]Admin. Rec. at 457.

[91]Admin. Rec. at 457.

-17-

possible."[92]

Plaintiff had surgery on July 7, 2010.[93]

On July 20, 2010, Dr. Seidel noted that plaintiff's "pathology report showed that this is a benign lipoma.  Intraoperatively this was certainly causing a mass effect on the plantar soft tissues.  The patient's sutures were removed today. She will remain in the postop shoe for another 2 weeks and we will see her back at that time in anticipation of release to full activities."[94]

On August 19, 2010, Dr. Seidel noted that plaintiff's "incision is now completely healed.  She is now released to activities and shoe wear as tolerated."[95]

On August 31, 2010, Dr. Seidel noted that plaintiff's "incision continues to heal well. There are still a few small spots which have not completely healed.  There is no evidence of infection.  Like her to continue in the postoperative shoe and see me back in 2 weeks.  I have emphasized the importance of elevating to reduce the swelling so that the incision w[ill] heal completely."[96]

On December 9, 2010, plaintiff complained of "recurrent severe pain in the" plantar

---

[92]Admin. Rec. at 456.

[93]Admin. Rec. at 459.

[94]Admin. Rec. at 749.

[95]Admin. Rec. at 744.

[96]Admin. Rec. at 534.

aspect of her foot "as well as pain in the third and fourth toes.  Plain films today do not reveal any bony abnormality.  We will send her for a new MRI scan to rule out recurrence of the mass."[97]

On January 3, 2011, plaintiff complained to Dr. Brimacombe of "continued left forefoot pain around her first second and third toes on both the plantar and dorsal surface.  She had a resection of a benign tumor near her third webspace.  The incision was through the bottom of her foot.  The wound is well healed at this point in time.  There is tenderness to palpation along the incision.  There is also tenderness to palpation under the first second and third ray.  She has pain with dorsiflexion of her first 3 metatarsophalangeal joints.  She is very stiff with range of motion of these joints as well.  She has good sensation in her toes.  Her pain does not sound nerve related.  I suspect her pain is due to scarring from her surgery.  I did not get the sense of a specific nerve injury as 3 toes are involved.  I would like her to go to therapy and be aggressive with trying to increase her motion and decrease her hypersensitivity on her foot.  Depending on the results of therapy, I may consider a diagnostic injection of her plantar foot.  Her MRI did not show any recurrence of tumor.  There is no gross neuroma noted."[98]

On April 20, 2011, plaintiff reported that she has sprained her left ankle on April 15, 2011.  "She has swelling and tenderness to palpation.  There is a stiffness and some weakness

---

[97]Admin. Rec. at 742.

[98]Admin. Rec. at 739.

with strength testing.  She has no medial tenderness.  Patient also reports that her plantar foot

pain has improved significantly.  Her great toe range of motion has improved.  She does have

some cramping through her foot in the evening time.  Overall patient has strong pulses.  Her

feet are warm.  She has good sensation with no numbness or tingling.  She has good motion

and strength.  X-rays show no fracture of her ankle.  We will treat her for an ankle sprain.

We talked about rest, elevation, compression, ice, and bracing.  She'll try to buy a brace at the

store.  We talked about physical therapy, but she has used up most of her visits.  She'll see

me back in a couple of weeks if she has any lingering trouble.  As for the cramping in her

foot, I think this is going to be transient and get better with time.  I do not detect any

neurological or vascular abnormalities.  There is no motor or bony deformity either."[99]

### F.  Dr. Bucholz/The Pain Center of Arizona

On July 9, 2010 plaintiff began seeing Dr. Bucholz for pain management.  Dr. Bucholz's

exam showed that plaintiff was "well developed, well nourished; easily responsive to visual,

verbal and tactile stimulation, oriented x 4; no apparent deformities; well groomed;

cooperative; appears healthy.  Appears same as stated age.  Ability to communicate: Normal.

Patient arrived at The Pain Center of Arizona today using crutches....  Face and head

symmetry and contour normal.  No contusions noted.  No lacerations noted.  No masses

noted.  No scars noted. No skin lesions noted....  Neck: symmetrical, trachea is  midline; no

---

[99]Admin. Rec. at 737.

neck masses; no skin lesions; no lacerations.  Hyoid position normal.  Respiratory:  Chest Wall expands normally and no deformities noted.  Respiratory Effort normal.  Gastrointestinal:  Flank normal with no masses or tenderness....  Musculoskeletal:  Station normal.  Digits: symmetrical; without masses.  Range of motion:  flexion is normal (at least 90 degrees); extension is normal (at least to midline).  Cervical spine:  Normal to inspection....  Skin:  Scalp hair normal.   Eyelashes normal.   Facial hair:  normal texture; normal quantity and distribution.  Hair on extremities:  normal on the upper extremities, normal on the lower extremities."[100]  Dr. Bucholz wrote that plaintiff was "a new patient with a chief complaint of chronic low back, left knee, and left foot pain.  She also has a secondary chief complaint of essentially polyarthralgia.   She recently underwent left foot surgery consisting of a neuroma excision.  She is seen in a walking immobilizer and with crutches for that.  She has MRI evidence of an L5-S1 disk protrusion.  She admits to left buttock and leg pain with numbness around the knee.  She does take oxycodone typically tid with moderate relief.  She expects to have surgical restrictions regarding her left foot for the next 'three to six weeks.' Because of her innate immobility, a full physical examination is difficult to perform."[101]  Dr. Bucholz's assessments were lumbar radicular pain, left foot pain, and questionable left knee

---

[100]Admin. Rec. at 466-467.

[101]Admin. Rec. at 468.

pain.[102]

On September 7, 2010, plaintiff reported no change in her pain since her last visit, that her pain level was a 7, and that her pain "interferes with most, but not all, daily activities."[103] Dr. Bucholz "perform[ed] the patient's first left L5 transforminal epidural steroid injection" and refilled plaintiff's pain meds.[104]

On September 21, 2010, plaintiff rated her pain as an 8, and Dr. Bucholz did a second left L5 transforminal epidural steroid injection.[105]

On October 12, 2010, plaintiff rated her pain as a 9; and Dr. Bucholz did a third left L5 transforminal epidural steroid injection and ordered her "a 4-wheeled walker with brakes and a seat" due to "[h]er difficulty with prolonged sitting and walking...."[106] Dr. Bucholz's recommendations were "for further conservative palliative care and specifically further maneuver toward palliation of the described pain symptomatology in the form of a course of physical therapy.  Discussion has centered around a regimen that will begin incorporat[ing] some pain relieving manual therapies initially and progress to a course of

---

[102]Admin. Rec. at 468.

[103]Admin. Rec. at 574.

[104]Admin. Rec. at 577.

[105]Admin. Rec. at 579 & 582.

[106]Admin. Rec. at 583 & 586.

stretching, strengthening, and conditioning as appropriate and as tolerated."[107]

On November 10, 2010, plaintiff "return[ed] ... for ongoing evaluation and management of her chronic pain.  The patient states her current medication regime is modestly effective in controlling her pain.  She denies any side effects secondary to this."[108]  "Based on the clinical presentation, [Dr. Bucholz] believe[d] it to be both reasonable and medically necessary to continue with the prescribed pain management plan."[109]  Dr. Bucholz's diagnoses were lumbosacral spondylosis with facet syndrome and lumbar radiculopathy.[110]

On December 7, 2010, plaintiff reported that "her current medication regimen is modestly effective in controlling her pain.  However, she does feel that she does, at times, need to take an extra hydrocodone and states that the cold weather has exacerbated her pain.  She does continue with physical therapy as previously ordered and states that she is compliant with her home exercise program.  She further states that her lumbar injections in the past did not provide her with any relief for any amount of time.  She does state that she does continue to have low back pain that does radiate down the lateral thighs.  She does have some associated numbness at times in the anterior portion of both thighs.  She does continue

---

[107]Admin. Rec. at 585.

[108]Admin. Rec. at 589.

[109]Admin. Rec. at 589.

[110]Admin. Rec. at 589.

to walk with a front-wheeled walker."[111]

On January 10, 2011, plaintiff reported that "[s]he has recently begun physical therapy and is hopeful about the possibilities that it holds for her. She is tolerating her medications well. She states that with her increase in exercise she has felt the need to take additional medication. She denies side effects."[112]

On February 7, 2011, plaintiff complained "of lumbosacral pain as well as bilateral upper quadrant abdominal pain. The patient admits that she is having surgery tomorrow for a hernia repair.... She questions whether or not we will be managing her postoperative pain. I stated that yes, in fact, we will. She states that in the past Percocet has worked well for postoperative pain and that she does not feel her current hydrocodone dose would adequately control her postoperative pain. The patient was participating regularly in physical therapy. She has 3 visits left, but her surgeon told her to discontinue physical therapy for 1 week prior to her surgery. She is not to resume physical therapy until cleared by her surgeon. In addition, the patient admits to chronic constipation for which she uses over-the-counter stool softeners and laxatives. In addition, the patient has again been told to stay off her ibuprofen for 6 days prior to her surgery. On physical exam, the patient does have tenderness to the bilateral upper quadrants as well as bilateral lower quadrants of the

---

[111]Admin. Rec. at 734.

[112]Admin. Rec. at 731.

-24-

abdomen.  Lumbar range of motion is decreased with flexion primarily due to abdominal pain.  There is no tenderness to palpation of the lumbar paraspinal or sacroiliac joints. Straight leg raise test is negative bilaterally."[113]  Dr. Bucholz's assessments were abdominal pain, myofascial pain, lumbar radiculopathy, lumbago, and muscle spasms.[114]

On March 14, 2011, plaintiff reported that "[s]he continues to have significant back and leg pain bilaterally to the calf.  She underwent abdominal hernia surgery approximately 3 weeks ago and continues to recover from that.  She will be following up with her surgeon in the near future.  Previously, she was in physical therapy with only mild improvement."[115] Dr. Bucholz's assessment was lumbar radicular pain and they discussed epidural steroid injections.[116]

On April 11, 2011, plaintiff "continue[d] to have back and left lower extremity predominant pain.  She feels that her abdominal pain has 'gotten a lot better' from the previous hernia surgery, and [she] would like to proceed with epidural injections.  She continues to have pain and tingling in an L5 distribution, with concordant straight leg raise maneuvers.  She also complains of newer onset left-sided neck pain, with radiation to the shoulder and decreased range of motion.  She states that she has cervical spine x-rays

---

[113]Admin. Rec. at 727.

[114]Admin. Rec. at 727.

[115]Admin. Rec. at 724.

[116]Admin. Rec. at 724.

scheduled, but these have yet to be done."[117]  Dr. Bucholz refilled plaintiff's ibuprofen and

Norco prescriptions and started her on Flexeril.[118]

On May 10, 2011, plaintiff reported that she "continues to have significant lumbar

radicular pain complaints.  We are awaiting authorization for the previously-discussed

epidural injections.  She is tolerating her medications well and denies side effects.  She does

state that she will be having bladder surgery likely within the next month."[119]

On July 13, 2011, plaintiff reported that "she had her bladder surgery done last month,

and is no longer having problems with urinary incontinence.  We have received insurance

authorization for her epidural steroid injections....  She continues to complain of pain in her

lower back on the left side in an L5-S1 distribution with radicular symptoms.  She states that

she is completely out of her hydrocodone for the last week due to increased pain from her

surgery."[120]

On August 5, 2011, Dr. Bucholz did plaintiff's first lumbar L5-S1 epidural injections.[121]

On September 9, 2011, Dr. Bucholz did plaintiff's second lumbar L5-S1 epidural steroid

---

[117]Admin. Rec. at 721.

[118]Admin. Rec. at 721.

[119]Admin. Rec. at 718.

[120]Admin. Rec. at 715.

[121]Admin. Rec. at 712.

injection.[122]

On October 7, 2011, plaintiff reported that "[h]er back and lumbar pain have improved approximately 50%. However, she is experiencing some abdominal pain, as she recovers from her recent surgery."[123] Dr. Bucholz did a third lumbar epidural steroid injection.[124]

On November 4, 2011, plaintiff complained "of increased right leg pain. At her last visit, the patient had an L5-S1 epidural steroid injection. This site is not red, swollen, and no possible indications of an infection were noted. She noted some relief of her back pain but has had an increased right leg pain. She is able to weight-bear. She ambulates without difficulty. She is not noting any increase in numbness. Her patellar reflexes are equal. She is complaining of increased difficulty sleeping because this pain is exacerbated at night. She does take Lyrica at h.s. but is unsure of the exact dosage. This is provided to her by another physician. She was asked to bring us a copy of her current medication list, at the next visit. We'll also institute trazodone for added neuropathic pain relief."[125]

On December 8, 2011, plaintiff complained "of right leg throbbing. This was relieved for 2 days by the Trazodone, but is now worse. The Trazodone will be discontinued and elavil will be started. I have explained to the patient that amitriptyline or Elavil is commonly

---

[122]Admin. Rec. at 708.

[123]Admin. Rec. at 703-704.

[124]Admin. Rec. at 704.

[125]Admin. Rec. at 700.

used for chronic pain, including nerve pain.  [S]he does have significant side effects which include drowsiness and constipation.  It also make take weeks before the total pain relief effect is achieved.  It is common to feel very tired when starting on this medication, which is [why it] is given at bedtime.  She was told to call us if she has any problems with the medication.  The patient is content on her current medications except for the trazodone.  She denies any side effects with her medications."[126]

On January 9, 2012, plaintiff reported that "[s]he is having significant bilateral back and buttock pain.  This is her primary pain generator.  She is having radiation down the proximal legs to the knees.  She has now been feeling this for 6 weeks.  Rest and oral antiinflammatories have not been successful.  She has a difficult time sitting.  She continues to have left knee pain as well.  On physical exam, she demonstrates positive tenderness to palpation over the bilateral sacroiliac joints.  Bilateral Patrick maneuvers and flexion, abduction, and external rotation (FABER) maneuvers significantly increase her symptoms.  Straight leg raise maneuvers are unremarkable.  There are no lower extremity sensory or motor deficits.  She has tenderness over the anterior left knee joint line.  She has increased pain and moderately decreased range of motion with left distal leg flexion.  She inquires about the possibility of left knee treatment as well."[127]  Dr. Bucholz's assessments were

---

[126]Admin. Rec. at 696.

[127]Admin. Rec. at 692.

sacroilitis, left knee pain, and myofascial pain.[128]

On January 24, 2012, plaintiff "denie[d] any changes in the location of her pain or in its general description since her last evaluation" and Dr. Bucholz did a sacroiliac joint injection.[129]

On February 7, 2012, plaintiff reported that her "left-sided back pain is significantly better. Her right-sided back and buttock pain are moderately better. She is also complaining of bilateral lower extremity radiating pain. She continues to have tenderness to palpation over both sacroiliac joints, right greater than left. She also demonstrates positive lumbar facet loading maneuvers bilaterally."[130] Dr. Bucholz did a bilateral sacroiliac joint injection.[131]

On March 6, 2012, plaintiff reported "two to three weeks of excellent pain relief from the last sacroilliac joint injection, but her symptoms have begun to return. She once again is having axial back and upper buttocks symptoms. She has palpatory tenderness over the sacroilliac joints, with increased pain with lumbar hyperextension maneuvers."[132] Dr. Bucholz performed "a diagnostic medial branch block, using local anesthetic only, of the bilateral L4 medical branches, the L5 dorsal rami, and the S1 and S2 lateral branches" and

---

[128]Admin. Rec. at 692-693.

[129]Admin. Rec. at 689.

[130]Admin. Rec. at 685-686.

[131]Admin. Rec. at 686.

[132]Admin. Rec. at 682.

"[i]n the recovery area after [the] procedure, the patient admitted to 80% relief of her concordant symptoms."[133]

On March 30, 2012, Dr. Bucholz did radiofrequency ablation of the left L4 medial branch, L5 dorsal rami, and S1-2 lateral branches.[134]  Plaintiff reported "100% pain relief for the expected duration of the local anesthetic from the last diagnostic medial branch block."[135]

On April 17, 2012, Dr. Bucholz did radiofrequency ablation on the right side at L4-L5, S1-S2.[136]

On May 1, 2012, FNP Seago noted that at plaintiff's "last visit she had a right L4 through S2 radiofrequency ablation.  She has noted an increase in what she calls gluteal pain. Her pain is centered at the sacroiliac joints bilaterally, right greater than left.  We discussed the fact that it may be some local irritation from the radiofrequency ablation, although her pain is bilateral, so this is doubtful.  Alternatively, she may just have some sacroiliac joint irritation, sacroilitis, as she has had this in the past.  We discussed sacroiliac joint injections. The patient is content with current medications, and denies any adverse effects from them."[137]

---

[133]Admin. Rec. at 682.

[134]Admin. Rec. at 678.

[135]Admin. Rec. at 678.

[136]Admin. Rec. at 674.

[137]Admin. Rec. at 672.

### G.  Arizona Kidney Disease and Hypertension Center

On August 11, 2010, Dr. Rodelas' physical exam showed a "[n]ormocephalic, alert female not in any acute distress.  HEENT: No conjuctive pallor.  No lesions over mouth, nose and ears.  NECK:  No neck vein distention, carotid bruit or lymphadenopathy.  The thyroid is not enlarged.  LUNGS:  Clear to ausculatation bilaterally.  HEART:  Good heart sounds.  No S3 gallop, pericardial rub, or murmur.  ABDOMEN:  Soft.  No hepatosplenomegaly and no CVA tenderness.  No other masses felt.  Bowel sounds are normoactive.  GU:  Rectal examination was not done.  EXTREMITIES:  No evidence of peripheral edema.  No joint swelling.  No decrease in pulses over the dorsalis pedis.  SKIN: No skin rash."[138] Dr. Rodelas believed that plaintiff had "chronic kidney disease possibly on the basis of chronic use of interstitial nephritis.  However, I do not believe that her kidney function is this severe and we will see if this is really a true GFR that she has and I ordered a 24-hour creatinine clearance on her after she comes in for the next visit.  I ordered a spot urine for eosinophil, creatinine, sodium and microalbumin on her.  I told her to stop the Ibuprofen and instead … take some Tramadol 50-100 mg three times daily along with Hydrocodone/APAP.  I ordered an ultrasound of the kidney just to make sure she does not have any pathology aside from what I suspect this last time."[139]

---

[138]Admin. Rec. at 517.

[139]Admin. Rec. at 517-518.

On October 13, 2010, plaintiff came in "for follow-up of her unexplained kidney failure which I thought might be due to non-steroidal anti-inflammatory drug induced acute interstitial nephritis. She had creatinine of 1.22 a month ago and had a serum creatinine of 1.16 during her initial visit with me. Her GFR was not too bad at 52 and I saw her again two months after her initial visit hoping that the creatinine would show some improvement or at least be stable, but instead of that, her creatinine went up further than the previous lab work of 1.16. It went up to 1.22. Her GFR estimate is about 49 cc per minute, but when she collected the urine for creatinine clearance, her creatinine clearance came back at 49 cc per minute, which is pretty close to the estimated GFR, she has. She had a negative work-up for secondary glomerulonephritis. She has no evidence of vasculitis. Her ANA is negative, her sedimentation rate is still low at 7. The rest of chemistries shows no proteinuria also in her urine which she measured for 24 hours and the microalbumin normalized was only 40 mg/gram of creatinine. I did not see any issue in the urine. I am wondering whether the diagnosis of interstitial nephritis is not present on her and rather we might be dealing with other causes. What I am wondering is whether she has other causes such as ischemic nephropathy. She has no history of trauma to the kidney, but her left kidney measured 9.4 cm while the right kidney measures 10.6 cm. She is hypertensive but controlled on amlodipine only. She may have an undiagnosed renovascular hypertension which is mild at this point so I am looking for renal artery stenosis either fibromuscular or something to that matter. The fact that the renal function is worsening rather than improving, points to the

fact that it may not be Ibuprofen although I still do not want her to take any non-steroidal anti-inflammatory drugs until I am absolutely sure it is not due to this particular disease."[140]

On December 23, 2010, an ultrasound of plaintiff's kidneys showed a "[s]maller left kidney which may be from prior infarctions or infections.  There is also mild hydronephrosis on the left.  The exact etiology is uncertain.  By ultrasound criteria no evidence for renal artery stenosis but would suggest CT to further evaluate the possible causes for left-sided hydronephrosis."[141]

On February 10, 2011, Dr. Rodelas "did a creatinine clearance on [plaintiff] and it came back 91 cc per minute which is excellent"; his physical exam was unremarkable; and he advised plaintiff not to take any non-steroidal anti-inflammatory drugs.[142]

On September 6, 2011, plaintiff came in "for follow-up of her chronic kidney disease stage II....  She has an interesting ultrasound of the kidney in that one of her kidneys [is] smaller than the other one suggesting that she may have renovascular hypertension.  I did not put her on anything.  She is well-controlled on just 5 mg of amlodipine without any problem with her blood pressure at all.  I did not think that she has renovascular hyperten-sion.  I think the smaller kidney might be due to a previous infection or she may have congenital small kidney.  The right kidney appears to be normal size and I did a creatinine

---

[140]Admin. Rec. at 506.

[141]Admin. Rec. at 647.

[142]Admin. Rec. at 645-646.

clearance on her showing that her GFR was like 91 cc per minute which is pretty good."[143]

### H.  No Appointment MD

On  December  13,  2010,  plaintiff  complained  of  a  cough,  sore  throat  and  nasal

congestion and reported that she was using her albuterol three times a day.[144]

On December 29, 2010, an MRI of plaintiff's abdomen showed [p]oor visualization of

the  pancreas,  no  hydronephrosis,  atrophic  left  kidney,  and  hernia  in  the  right  lower

quadrant.[145]

On January 6, 2011, plaintiff reported that her abdominal "area is still very sore.  States

it will turn red & has a burning sensation that will radiate toward her umbilious.  States is

growing in size in last mo.  States when it inflames it gets very hard & she can feel it

distinctly.  States when she is walking, she will get 'strange' stomach cramps across her

abdomen."[146]

On January 17, 2011, plaintiff stated that she was "very sore now.  Pain level 6 to 7.

Hurts when she stands/walks.  Desc[ribes] it as a burning sensation."[147]

On February 17, 2011, plaintiff complained of dizziness and left knee pain, swelling,

---

[143]Admin. Rec. at 643.

[144]Admin. Rec. at 821.

[145]Admin. Rec. at 830.

[146]Admin. Rec. at 820.

[147]Admin. Rec. at 819.

and numbness; and the assessments were knee numbness, knee pain, knee swelling, sinusitis, tonsilitis, and dizziness.[148]

On March 28, 2011, plaintiff complained that her allergies were making her asthma flare and she was still having trouble with her left foot and incontinence; and the assessments were hypertension, urinary frequency, urinary incontinence, asthma, allergic rhinitis, and bladder spasms.[149]

On May 12, 2011, plaintiff reported that she had stepped in a hole and injured her left ankle; she also complained of a severe dry mouth and chaffing lips.[150]  Plaintiff was advised to wrap her left ankle and was prescribed loratadine to help with dry mouth.[151]

On July 27, 2011, the assessments were sinusitis, hypertension, throat pain, dizziness, and allergic rhinitis.[152]

On August 9, 2011, plaintiff had a new complaint of abdominal pain, which she describes as "burning."[153]

On December 8, 2011, the assessments were mixed hyperlipidemia, hypertension, and

---

[148]Admin. Rec. at 818.

[149]Admin. Rec. at 817.

[150]Admin. Rec. at 816.

[151]Admin. Rec. at 816.

[152]Admin. Rec. at 815.

[153]Admin. Rec. at 814.

acute nasopharyngitis.[154]

On February 6, 2012, the assessments included hypertension, hyperlipidemia, and ventral hernia.[155]

On May 31, 2012, the assessments were chronic back pain, fibromyalgia, and asthma.[156]

I.  Dr. Borjeson

On January 12, 2011, plaintiff's CT scan of her abdomen and pelvis showed "left renal atrophy" and that the "lower ventral abdominal wall does contain a hernia."[157]

On January 21, 2011, Dr. Borjeson noted that plaintiff has "an incarcerated incisional hernia" and the plan was to do an "[o]pen repair with mesh."[158]

On February 8, 2011, plaintiff had incarcerated incisional hernia repair with mesh surgery.[159]

On February 25, 2011, Dr. Borjeson noted that plaintiff was "healing nicely...."[160]

On September 2, 2011, Dr. Borjeson noted that plaintiff "underwent open incisional

---

[154]Admin. Rec. at 811.

[155]Admin. Rec. at 809.

[156]Admin. Rec. at 806.

[157]Admin. Rec. at 663.

[158]Admin. Rec. at 662.

[159]Admin. Rec. at 668.

[160]Admin. Rec. at 661.

hernia repair with underlying mesh ... on 2/8/11.  She then underwent bladder sling by Dr. Hahn and has recurrence.  I do not recommend this being repaired laparoscopically as I would need to take down the bladder flap and would not want to damage the bladder sling as this is working approximately 80% for the patient and she is happy with this."[161]  The plan was to do an "[o]pen repair with larger overlay mesh."[162]

On September 22, 2011, Dr. Borjeson repaired a recurrent incarcerated incisional hernia.[163]

On March 8, 2012, Dr. Borjeson repaired plaintiff's ventral hernia.[164]

On March 23, 201, Dr. Borjeson noted that plaintiff was doing well except for some suture pain at the 3:00 stay suture; and the plan was to do a nerve block.[165]

### J.  Valley Orthopedics/Dr. Ferry

On February 4, 2011, plaintiff came in to have her left knee pain evaluated.[166]  Dr. Ferry recommended "conservative care", "which would involve rest, ice, and anti-inflammatory

---

[161]Admin. Rec. at 660.

[162]Admin. Rec. at 660.

[163]Admin. Rec. at 657.

[164]Admin. Rec. at 655.

[165]Admin. Rec. at 659.

[166]Admin. Rec. at 596.

medications."[167]  He stated that he was recommending conservative care because "I do not see any structural injury requiring surgery.  I cannot explain her subjective numbness based on a peripheral nerve distribution and recommend that she consider evaluation by a neurologist if it does not improve."[168]  Dr. Ferry's assessments were joint pain, localized in the knee; and lower back pain.[169]

### K. Canyon State Urology/Dr. Han

On April 18, 2011, plaintiff "present[ed] with incontinence.  She complains of leaking only with heavy stress maneuvers, moderate to severe urge incontinence, and nocturnal incontinence.  Associated symptoms include frequency, urgency, nocturia, and hesitancy."[170]  Plaintiff's physical exam was unremarkable and Dr. Han's assessments were incontinence and overactive bladder.[171]  Plaintiff was to arrange to have a urodynamics study done.[172]

Plaintiff's May 3, 2012 "urodynamic studies of the bladder show[ed] a normal capacity bladder and normal compliance.  There was stress incontinence demonstrated."[173]

---

[167]Admin. Rec. at 597.

[168]Admin. Rec. at 597.

[169]Admin. Rec. at 597.

[170]Admin. Rec. at 801.

[171]Admin. Rec. at 803.

[172]Admin. Rec. at 804.

[173]Admin. Rec. at 793.

On May 9, 2011, Dr. Han discussed medical management versus a sling with plaintiff, advising her that "the sling is synthetic and that there is a risk of erosion and that there is a small chance that the sling may have to be revised at a later date. I have also told her that the sling may actually worsen or cause urge incontinence."[174] Plaintiff elected to move forward with the sling, the surgery for which was done on May 21, 2012.[175]

On June 23, 2011, an ultrasound of plaintiff's kidneys showed that "[t]he kidneys appear intact" and a "contracted urinary bladder."[176]

On September 13, 2011, plaintiff "present[ed] with incontinence. Previously the patient has been treated with antichollnergic medication. The problem has been on-going since over a year."[177] Dr. Han's physical exam was unremarkable other than he noted that plaintiff walks with a limp.[178] Dr. Han's assessments were renal failure, unspecified; and overactive bladder; and plaintiff was to schedule a flow study.[179]

### L.  Dr. Sreecharana

On August 16, 2011, Dr. Sreecharana's physical "examination of the head, ears, nose,

---

[174]Admin. Rec. at 785.

[175]Admin. Rec. at 788.

[176]Admin. Rec. at 774.

[177]Admin. Rec. at 770.

[178]Admin. Rec. at 772-773.

[179]Admin. Rec. at 773.

-39-

throat, and neck reveals that the patient has several areas of eccymosis because of easy bruisability.  The heart and lung examination is normal.  The examination of the hands revealed that the patient has decreased sensation in the median nerve distribution of the right hand. The Tinel's, Phalen's, and carpal compression test is positive bilaterally.  There is no triggering of the fingers.  There is no atrophy of the muscles.  She is able to make a fist and range of motion of the wrist is normal."[180]  Dr. Sreecharana's assessment was bilateral carpal tunnel syndrome, right worse than left, but he "want[ed] to get formal electrodiagnostic study done by a neurologist to assess the severity of carpal tunnel syndrome prior to recommending surgery."[181]

Plaintiff's September 12, 2011 nerve study was abnormal, showing "evidence of a mild left median nerve lesion at the wrist."[182]

On September 15, 2011, Dr. Sreecharana noted that "[t]here is no change in the physical examination of the patient since I saw her last.  She has decreased sensation in median nerve distribution of the right hand.  The Tinel's sign, Phalen's test and carpal compression test is positive bilaterally.  There is no triggering of the fingers.  There is no atrophy of the muscles.  She is able to make a fist and the range of motion of wrist is

---

[180]Admin. Rec. at 654.

[181]Admin. Rec. at 654.

[182]Admin. Rec. at 752.

normal."[183] Dr. Sreecharana's assessment was "bilateral carpal tunnel syndrome right worse than left. Hand cramps and weakness."[184] The plan was as follows: "The patient has atypical symptoms. Electro diagnostic study does not confirm the diagnosis of carpal tunnel syndrome on the right side and is only mild on the left side. The patient is more symptomatic on the right side. I explained to her that I can perform carpal tunnel surgery with the hope of relieving tingling and numbness and burning pain of the fingers. The carpal tunnel surgery will not help with hand cramps, fingers locking up, swelling and stiffness of the fingers. Education pamphlet on carpal tunnel syndrome was given. Briefly the procedure, complications, risks, benefits and options of treatment were discussed with the patient. I left the decision to the patient regarding surgery. I also instructed the patient to pay attention to the symptoms to see whether she has significant issue with the tingling and numbness."[185]

II. Nonexamining sources

A. Dr. Ostrowski

On August 25, 2010, Terry Ostrowski, M.D., opined that plaintiff could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand/walk 6 hours, sit 6 hours, could frequently climb ramps/stairs, could occasionally climb ladder/ropes/scaffolds, could occasionally crawl, and should avoid concentrated exposure to fumes, odors, dusts, gases,

---

[183]Admin. Rec. at 650.

[184]Admin. Rec. at 650.

[185]Admin. Rec. at 650.

and poor ventilation.[186]

### B.  Dr. Orenstein

On February 15, 2011, Marilyn Orenstein, M.D., opined that plaintiff could occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk 6 hours; sit 6 hours; frequently climb ramps/stairs; occasionally climb ladders/ropes/scaffolds; frequently balance, stoop, kneel, and crouch; occasionally crawl; and should avoid concentrated exposure to vibration, fumes, gases, dusts, poor ventilation, and hazards.[187]

---

[186]Admin. Rec. at 83-84.

[187]Admin. Rec. at 108-109.